SEESTEDT v. JONES.

1. FRAUD—ONE ACTIVE IN FRAUD LIABLE THEREFOR ALTHOUGH HE
RECEIVED NO BENEFIT THEREFROM.
    In an action against an inventor and his attorney for
    money obtained by false and fraudulent representations,
    where the attorney told plaintiff that a patent had been
    allowed when in fact it had been rejected, of which fact
    he had notice, he was liable jointly with the inventor even
    if he did not receive any benefit from the fraud.[1]

2. FRAUDS, STATUTE OF—MISREPRESENTATION AS TO ALLOWANCE OF
PATENT NOT REQUIRED TO BE IN WRITING.
    Where a patent attorney falsely represented to plaintiff
    that a patent had been allowed, when in fact it had been
    rejected, and he knew it, he is not exempt from liability
    therefor under 3 Comp. Laws 1915, § 11983, because said
    representation was not in writing; said statute not being
    applicable.[2]

Error to Wayne; Webster (Arthur), J. Sub-
mitted January 9, 1925. (Docket No. 60.) Decided
April 3, 1925.

Case by Herman F. Seestedt against Lee E. Jones
and Samuel E. Thomas for fraud. Judgment for
plaintiff. Defendants bring error. Affirmed.

*John D. Harger* (*James Swan* and *George H. Kretz-
schmar*, of counsel), for appellant Thomas.

*Moore & Moore,* for appellee.

STEERE, J. Plaintiff is a builder and contractor
residing and doing business in the city of Detroit.
Defendant Jones is a resident of Detroit who at the

[1]Fraud, 26 C. J. § 88; 27 C. J. § 124; [2]Frauds, Statute of, 27
C. J. § 75.

time of this litigation had invented, as he claimed, an improved piston ring which he proposed to patent, and organize a company for its manufacture and sale. Defendant Thomas is a patent-right attorney whom Jones engaged to obtain a patent on his invention. On July 16, 1919, Jones entered into a contract with plaintiff and a party named Foster which in brief stated Jones was the owner and inventor of a certain device known as an improvement in piston rings and had made application to the United States for a patent. Being desirous of securing funds to meet the necessary expenses of completing the patent and effecting a corporation for its manufacture and sale and transferring to Seestedt and Foster a certain number of shares of the stock in a corporation to be formed which they were desirous of securing, it was agreed that Seestedt would, upon the signing of the contract between them, loan to Jones $1,000 to be paid out of the first dividends due to Jones from his interest in the corporation to be formed. As security therefor Jones would make an assignment of his application for a patent to Seestedt, to be held in escrow by some person agreed upon, subject to the payment of said loan. Upon the incorporation of the proposed company being completed said assignment would be returned to Jones who would then assign to Seestedt $5,000 in amount of his shares of stock of the company as security for the payment of the $1,000. It was further agreed that upon the issuance of letters patent for said device the contracting parties would promptly incorporate a company for its manufacture and sale with a capital of $75,000, to be divided into $50,000 of common and $25,000 of preferred stock, and Jones should then transfer the patent to the corporation, receiving $25,000 of the common stock therefor. Foster was to have $8,333 1/3 of the common stock for promotion work, and Seestedt was to receive $16,666 2/3 of common stock; in considera-

tion therefor the latter agreed "to finance said company, to the extent of $25,000 from the sale of the preferred stock or otherwise immediately upon the incorporation." On the same date Jones executed an assignment to Seestedt, in harmony with their agreement, of the interest he had or might have "in and to said invention and patent for, to and in the county of Wayne and the State of Michigan."

Seestedt furnished Jones the $1,000 as agreed but the proposed corporation never materialized owing to the fact that no patent was ever obtained upon Jones' claimed invention. Seestedt then tendered back his contract and demanded return of the $1,000 he had paid Jones and on refusal brought this action to recover the same, claiming he was induced to part with his money by false and fraudulent representations made to him by Jones and his patent attorney, Thomas.

Jones consulted with and employed Thomas to secure the patent early in May, 1919. Application and claim were filed in the patent office May 31, 1919. On June 27, 1919, the claim was rejected because anticipated by two previous patents and Thomas was so notified by the patent office in due course of mail.

Seestedt went with Foster at the latter's suggestion to meet Jones early in May. Jones then explained to Seestedt the nature of his invention in alluring detail, and said, as plaintiff testified, that he had a patent on it which was basic, its use gave automobiles from 15 to 30 per cent. more mileage to the gallon of gasoline, made a great saving in lubricating oil, lengthened the life of the motor, there was nothing else like it and this invention was the only thing of the kind. Seestedt was favorably impressed and negotiations followed, culminating in the contract of July 16, 1919, under which he parted with his thousand dollars.

During these negotiations he learned that the basic patent on his invention, which Jones claimed to have, had not yet been perfected. Jones, Seestedt and Foster then went, on July 12, 1919, to see Thomas about it. Foster testified that he asked Thomas the direct question whether there was "any trouble about these patents?" and he said:

" 'No, sir. We will get a patent,' * * * I had seen Mr. Thomas myself, individually, two or three times before Mr. Seestedt was with me. Mr. Thomas did not at any time tell me that the application had been denied, or the patent, before the 15th of October."

Seestedt testified that Thomas showed them the blue prints of the Jones patent, and said amongst other things that he had made a careful examination and there was nothing else like it, the application for a patent had been received by the patent office, and while the patent was not yet issued the application was in and as soon as it was reached they would get the patent, made no mention of any previous patent, or of the application having been rejected, and said when they talked of the proposed security for this $1,000 loan to Jones,—

"that the application in that case would be assigned, which would be just as good, because the application had been accepted and the patent would be allowed as soon as the application would receive its turn in the patent office."

On the defense Thomas testified that he received notice from the patent office that the application was denied before July 12, 1919, and when Seestedt, Jones and Foster called at his office on that day he so told them; that the rejection was based on two prior patents which he had examined in his preliminary investigation before making the application and in his opinion they did not cover the meritorious practical features of the Jones invention; that he showed them

the drawings of the Jones device and a copy of the Mummert patent mentioned in the notice of rejection, explained the matter fully to them and pointed out to them the distinction, using a blackboard; that he did not say to them that he "could and would procure a patent on this article," and "made no guaranty in any form," but would and did take steps to renew the application and review final action of the primary examiner in conformity with the patent office practice, and notified his client, Jones, of his rights in that particular, but Jones did not authorize him to proceed further; that he received none of the money Jones obtained from Seestedt and all he ever received was what Jones paid him before the application was filed for his professional services as a patent attorney. It appears undisputed that the contract between the parties was drawn and executed in Thomas' office and, preparatory to its being drawn, he took from their dictation a memorandum of the terms they had agreed upon, at which time Seestedt testified Thomas told him that an assignment would be just as good because the application had been accepted and patent would be allowed as soon as the application was reached in its turn in the patent office.

When the parties went to Thomas' office at the appointed time to sign the contract, on July 16, 1919, Seestedt took his attorney, H. F. Coyle, with him to look it over and advise him if it was in proper form, or "all right," which he did. Coyle testified that nothing was said at that time about the patent having been rejected, but Thomas, in speaking of the invention, said "it was so good that he wished he had some of the stock." He knew from the contract which he looked over that Jones was to give Seestedt an assignment of his application as collateral for a thousand-dollar loan. Thomas did not say anything about its having been rejected or that the patent had been or would be issued, but he (Coyle) understood

the situation to be that the application had been made, was pending and patent would eventually issue; nothing was said about any other patent, no one suggested that the application was questioned or had been denied, and he left as soon as the contract was signed. He started but was not permitted to tell what his advice to Seestedt would have been had he known that fact.

At close of the proofs a directed verdict was asked in behalf of both defendants which was denied and the case submitted to the jury, resulting in a verdict for plaintiff of $1,000 with interest at 5 per cent. per annum from November 1, 1919, when he gave notice of rescission with tender and demand for restitution.

No brief is filed for Jones in this appeal. The errors particularly stressed in behalf of Thomas are an instruction to the jury, in answer to an inquiry by their foreman, that if they found for plaintiff their verdict should be for $1,000 with interest and, as the evidence showed Thomas was acting for Jones as his agent, their verdict should be for or against both; and refusal to direct acquittal of Thomas on the ground that if any false representations of fact were made by him they were not in writing, he was a third party not interested in the contract, received no benefit from it, and was immune from liability under section 11983, 3 Comp. Laws 1915.

The court charged the jury that the claimed false and fraudulent representations must be of a material, existing fact, that plaintiff believed the same to be true and was thereby induced to enter into the contract; that fraud cannot be predicated on expression of opinion, however strongly or positively urged; and narrowed the basic issue of fact in the case so far as Thomas was concerned to whether he told plaintiff the application had been allowed, thereby negativing and concealing the fact that it had been rejected. This was asserted by plaintiff and denied by defend-

ants. The verdict of the jury supported plaintiff's contention. Thomas admitted he then knew the application had been rejected. He was the attorney and agent of Jones, spoke for him and in his presence, to plaintiff with whom Jones was dealing at arm's length. He knew the purpose of the inquiry for he said, as plaintiff testified and the jury found, that the application could be assigned because it had been allowed, and relying on that false statement plaintiff signed the contract prepared by him or under his direction and executed in his office, in his and Jones' presence. Without his active participation in the fraud it could not have been perpetrated. Under such a state of facts he was a joint tort feasor with Jones and the court did not err in telling the jury that both should be acquitted or both convicted as they might determine the issues submitted to them.

Section 11983, 3 Comp. Laws 1915, reads as follows:

"No action shall be brought to charge any person, upon or by reason of any favorable representation or assurance, made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

Thomas made no representations concerning the character, credit or other named attributes of Jones. The false and fraudulent representations he is charged to have made with intent to deceive are that the application for a patent which he made had been allowed when in fact it had been rejected, and he knew it.

That act follows in substance and essential wording an old English statute of frauds known as the Lord Tenterden act, which was enacted in 1828 (stat. 9 Geo. iv, chap. 14). It was early adopted in this jurisdiction and has been upon our statute books for

many years (Rev. Stat. 1838, p. 330).  It was long ago said of it by this court:

"While the statute should be given all reasonable effect, it ought to be confined to such cases as fall fairly within it.  It could not have been designed to furnish covers for fraudulent conspiracies not manifestly within its terms."  *Bush* v. *Sprague*, 51 Mich. 41, 54.

In *Nevada Bank* v. *Portland Nat. Bank*, 59 Fed. 338, it is noted that the tendency of decisions in States which have adopted the Lord Tenterden act has been to so construe it as "to modify the protection which the statute affords to fraud by enforcing a strict construction of its provisions."

Upon the questions of fraud and *scienter* of an agent the court instructed the jury in part as follows:

"In the case of a person who does not receive the proceeds of the fraud, he cannot be held liable unless he knew the representations to be false, or made them in reckless disregard of their truth or falsity so as to amount to a constructive knowledge.  Where, however, an agent knows a representation to be false when he makes it, he will be held liable for making the representation although he himself does not receive the proceeds of the fraud."

This statement of the law finds support in the following excerpt from *Weber* v. *Weber*, 47 Mich. 569:

"Neither is it true that an agent is exempt from liability for fraud knowingly committed on behalf of his principal.  A person cannot avoid responsibility merely because he gets no personal advantage from his fraud.  All persons who are active in defrauding others are liable for what they do, whether they act in one capacity or another.  *  *  *  And while it may be true that the principal is often liable for the fraud of his agent though himself honest, his own fraud will not exonerate his fraudulent agent."

Although plaintiff's claim and proof of damages was limited to the money he advanced to Jones in aid of

the project, yet the false and fraudulent representations, knowingly and recklessly made by Thomas for Jones went to the validity of the whole contract and value of the entire enterprise, for development of which the money advanced by plaintiff was but an incident.     Under the undisputed circumstances of this transaction and determination of the disputed facts by the jury, Thomas' claim of immunity is not within the letter, intent or spirit of the act.

The judgment will stand affirmed.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.